# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **LEANNA BOGGS SWINEY,** | ) | |
| Plaintiff | ) | |
| v. | ) | Civil Action No. 2:14cv00029 |
| | ) | **MEMORANDUM OPINION** |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

## I. Background and Standard of Review

Plaintiff, Leanna Boggs Swiney, ("Swiney"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2011 & West 2012). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge upon transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642

(4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Swiney protectively filed her applications for DIB and SSI on February 11, 2011, alleging disability as of January 8, 2011, due to scoliosis; leg problems; obsessive compulsive disorder, ("OCD"); bipolar disorder; borderline personality disorder; anxiety; depression; and fatigue. (Record, ("R."), at 198-206, 212, 216, 250.) The claims were denied initially and upon reconsideration. (R. at 114-16, 121-23, 127, 128-30, 132-34, 135-37, 139-41.) Swiney then requested a hearing before an administrative law judge, ("ALJ"). (R. at 142.) A video hearing was held on April 1, 2013, at which Swiney was represented by counsel. (R. at 28-57.)

By decision dated April 12, 2013, the ALJ denied Swiney's claims. (R. at 12-22.) The ALJ found that Swiney met the disability insured status requirements of the Act for DIB purposes through September 30, 2015.[1] (R. at 14.) The ALJ found that Swiney had not engaged in substantial gainful activity since January 8, 2011, the alleged onset date. (R. at 14.) The ALJ found that the medical evidence established that Swiney had severe impairments, namely depression; personality disorder; anxiety; bipolar disorder; scoliosis; and obesity, but he found that Swiney did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 4-16.) The ALJ found that Swiney had the residual functional capacity to

---

[1] Thus, to be eligible for benefits, Swiney must show disability between January 8, 2011, the alleged onset date, and April 12, 2013, the date of the ALJ's decision.

perform simple, routine, repetitive, unskilled light work[2] that required no more than occasional decision making, use of judgment, changes in the work setting or interaction with others and that did not require more than occasional stooping, crawling, exposure to hazards or climbing of ladders, ropes or scaffolds. (R. at 16.) The ALJ found that Swiney was unable to perform any of her past relevant work. (R. at 21.)  Based on Swiney's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed in the national economy that Swiney could perform, including jobs as an assembler, a mail routing clerk and a library shelving clerk. (R. at 21-22.) Thus, the ALJ concluded that Swiney was not under a disability as defined by the Act and was not eligible for DIB or SSI benefits. (R. at 22.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2015).

After the ALJ issued his decision, Swiney pursued her administrative appeals, (R. at 7), but the Appeals Council denied her request for review. (R. at 1-5.) Swiney then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2015). This case is before this court on Swiney's motion for summary judgment filed February 10, 2015, and the Commissioner's motion for summary judgment filed March 12, 2015.

---

[2]   Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, she also can do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2015).

## II. Facts

Swiney was born in 1985, (R. at 198, 202), which classifies her as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). She has a high school education and one year of college instruction. (R. at 32, 217.) She has past work experience as a restaurant worker, as a telecommunications support person in a call center and as a personal care aide. (R. at 32-33, 217.) Swiney testified that she previously had been denied benefits, after which she returned to work as a personal care aide, but stopped because she was unable to care for patients requiring more intensive care. (R. at 34.) This was approximately the same time she became pregnant with her second child. (R. at 34.) Swiney testified that she suffered from scoliosis, which made one shoulder and one hip higher than the others. (R. at 49.) She stated that she broke her right leg in a motor vehicle accident, causing it to be shorter than the other and adding to the balance difficulties caused by her scoliosis. (R. at 49.) Swiney stated that these balance difficulties caused her to fall a lot. (R. at 50.) She stated that she was diagnosed with osteoporosis at age 27, for which she received a Prolia injection, and for which she took calcium daily. (R. at 50.) Swiney testified that her pain level never went below a four or five on a 10-point scale, but she coped with it the best she could. (R. at 49.) She stated that she could not stand for very long, that sitting generally was uncomfortable, and sitting for long periods of time was difficult. (R. at 36, 51-52.) She estimated that she could sit for 30 minutes on a good day and not at all on a bad day. (R. at 51.) Swiney testified that she could lift her baby and change his diaper. (R. at 35.) She stated that she had to take frequent breaks and sit down when performing housework and that she used a stool while washing dishes to alternate between standing and sitting. (R. at 52.) Swiney stated that pain medication made her pain bearable. (R. at 52.) She testified that she elevated

her feet in a recliner, used a heating pad and used bath salts in an effort to alleviate her pain. (R. at 53-54.) Swiney stated that her pain interfered with her sleep, causing her to be tired all of the time and resulting in her usually taking naps during the day. (R. at 51.)

Swiney also testified that she had experienced panic attacks approximately every other day for two or three years, that she experienced crying spells and memory and concentration problems and that she did not deal well with other people, including family. (R. at 45-47.) Swiney testified that she no longer had any friends because she did not go anywhere and did not want to be bothered with people, and she spent most of her time at home. (R. at 47-48.) She testified that she had been fired from a job for calling the human resource representative a "bad word," and she stated that she had difficulty getting along with co-workers. (R. at 53.) Swiney testified that on a "bad day," she would get a babysitter and essentially stay in bed, and on a "moderate to a bad day," she would read or watch television and "fidget." (R. at 52-53.) She stated that she would ask one of the children's grandmothers to take the children if she was having a bad panic attack or was really emotional because she did not want them to see her that way. (R. at 48.) Swiney estimated that she would ask for such help once weekly or less. (R. at 48-49.) She further estimated that she would miss four or five days of work monthly. (R. at 36.)

Marvin Gardner, a psychological expert,[3] also was present and testified at Swiney's hearing. (R. at 37-46.) Gardner noted that most of the residual functional capacity assessments contained in the record were inconsistent with the

---

[3] Neither Gardner's title nor qualifications is contained in the record. The ALJ simply stated that Gardner was serving as a psychological expert. (R. at 37.)

treatment notes, which, longitudinally, were rather consistent. (R. at 38-39.) He testified that an individual with the limitations stated in Spangler's report would be able to perform simple and repetitive work from a concentration standpoint. (R. at 40.) However, he noted that Spangler's mental assessment of Swiney indicated that she had a poor or no ability to maintain attention and concentration. (R. at 40.) In response to questioning from Gardner and the ALJ, Swiney testified that she experienced approximately 16 panic attacks monthly, each of which disabled her for 30 to 45 minutes. (R. at 40-42.) Based on this testimony, Gardner found that Swiney's mental impairments met the "A criteria" for the listing for anxiety-related disorders, found at § 12.06, due to the recurrence of panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom, occurring on the average of at least once a week. (R. at 43.) However, Gardner testified that her mental impairments did not meet the "B criteria" because, in part, no one suggested that she had marked restrictions in activities of daily living. (R. at 43.) He also concluded that there was no evidence of a marked difficulty maintaining social functioning. (R. at 44.) In arriving at this conclusion, Gardner noted that, despite a residual functional capacity assessment indicating that Swiney had a poor or no ability to maintain social functioning, the corresponding report indicated that Swiney was socially confident, but anxious and depressed. (R. at 44.) Gardner further noted that no one actually asked her how she got along with supervisors, co-workers and others in the workplace. (R. at 44.) Thus, Gardner concluded that there were no records, whether from the past, or in a particular evaluation session, that Swiney had any difficulty with panic relating from the social skills standpoint. (R. at 44.) Next, Gardner found that there was no evidence of a marked restriction in Swiney's ability to maintain concentration, persistence or pace. (R. at 44-45.) In reaching this conclusion, Gardner noted Spangler's residual functional capacity assessment

of Swiney, in which he found marked problems maintaining concentration or pace. (R. at 44.) However, Gardner further noted that such findings were inconsistent with Spangler's own report, in which he found that Swiney's memory was fairly good. (R. at 44.) More specifically, Spangler noted that Swiney could repeat three words after five minutes, and she repeated eight numbers forward and five backward. (R. at 44.) According to Gardner, such abilities are indicative of excellent concentration. (R. at 44.) Gardner noted that Swiney did perform serial 7's slowly and serial 5's adequately, the most serious interpretation of which would be that her ability to concentrate might be as much as moderately impaired from performing simple and routine work tasks. (R. at 44.) Lastly, with respect to the "B criteria," Gardner testified that Swiney had not experienced any episodes of decompensation. (R. at 45.)

Asheley Wells, a vocational expert, also was present and testified at Swiney's hearing. (R. at 54-56.) Wells classified Swiney's work as a sandwich maker at a Subway restaurant as medium[4] and unskilled and as a telephone representative as sedentary[5] and semi-skilled. (R. at 55.) Wells was asked to consider a hypothetical individual of Swiney's age, education and work history who could perform simple, routine, repetitive, unskilled light work that required no more than occasional decision making, changes in the work setting, use of

---

[4] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, she also can do light and sedentary work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2015).

[5] Sedentary work involves lifting items weighing no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2015).

judgment or interaction with co-workers, supervisors and the public, and which required no more than occasional exposure to any type of hazards or unprotected heights or climbing of ladders, ropes or scaffolds and no more than occasional stooping or crawling.  (R. at 55.)  Wells testified that such an individual could not perform any of Swiney's past work, but could perform other jobs existing in significant numbers in the national economy, including those of an assembler, a mail routing clerk and a library shelving clerk.  (R. at 55-56.)  Wells was next asked to consider the same hypothetical individual, but who had an unsatisfactory or inadequate ability to perform in the areas of functioning independently, relating to others, maintaining attention and concentration, performing even simple job instructions, maintaining personal appearance, behaving in a stable manner and demonstrating reliability, and who would miss several days of work monthly.  (R. at 56.)  Wells testified that such an individual could not perform any jobs.  (R. at 56.) Wells testified that, typically, one absence monthly was acceptable in most employment.  (R. at 56.)

In rendering his decision, the ALJ reviewed records from Stone Mountain Health Services; Mountain Regional Medical Center; Anne Jacobe, L.C.S.W., a licensed clinical social worker; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; Jeanne Buyck, Ph.D., a state agency psychologist; Dr. Andrew Bockner, M.D., a state agency physician;  Dr. Bert Spetzler, M.D., a state agency physician; Louis Perrott, Ph.D., a state agency psychologist; Dr. John Sadler, M.D., a state agency physician; Live Well Family Health; Misty Bendall, F.N.P., a family nurse practitioner; Norton Community Hospital; Shriner's Hospital for Children; Lonesome Pine Hospital; and Robert S. Spangler, Ed.D., a licensed psychologist.

With regard to Swiney's physical impairments, she saw Misty Bendall, F.N.P., a family nurse practitioner at Live Well Family Health, on five occasions from January 26, 2011, through March 14, 2012.  On January 26, 2011, Swiney saw Bendall to reestablished herself as a patient.  (R. at 362.)  She complained of back pain, after falling two months previously, as well as social isolation.  (R. at 362.)  Bendall noted a general appearance of "severe malalignment" and scoliosis, but without spinal tenderness.  (R. at 362.)  Swiney reported a desire to return to school. (R. at 362.) Bendall diagnosed severe scoliosis; lumbago; dysthymic disorder; and bipolar disorder, and she prescribed Tegretol, Prozac, Lortab, Alprazolam and Valium.  (R. at 362.)

Bendall completed a Medical Evaluation form for Swiney on February 9, 2011, in connection with an application to receive Temporary Assistance for Needy Families, ("TANF"), benefits.  (R. at 402-03.)  She opined that Swiney was not able to participate in employment and training activities at that time and would not be able to do so for three months due to severe scoliosis with limited mobility, as well as dysthymic disorder and bipolar disorder. (R. at 402-03.)  Nonetheless, Bendall concluded that Swiney's condition did not hinder her ability to care for her child. (R. at 403.) She recommended that Swiney apply for SSI or DIB benefits. (R. at 403.)

Swiney presented to the emergency department at Mountain View Regional Medical Center, ("Mountain View"), on February 17, 2011, with complaints of sharp back pain, exacerbated by movement, which began that day.  (R. at 341-42.) A urine screen confirmed that Swiney was pregnant and that she had a urinary tract infection.  (R. at 342-43.)  Physical examination showed a decreased range of motion of the back.  (R. at 342.)  She was fully oriented, with no apparent motor or

sensory deficit, but had difficulty walking. (R. at 342.) She was diagnosed with low back pain and a urinary tract infection, and she was prescribed Keflex. (R. at 342.) She was advised to stop all other medications and see an obstetrician as soon as possible. (R. at 342.)

When Swiney returned to Bendall on February 25, 2011, she complained of increased back pain. (R. at 363.) She reported that she was nine weeks pregnant, but that she felt good. (R. at 363.) A physical examination showed scoliosis without spinal tenderness. (R. at 363.) She was taking no medications at that time due to her pregnancy. (R. at 361.) Bendall completed another Medical Evaluation form for Swiney on May 20, 2011, finding that she would be unable to participate in employment and training activities for six months due to her scoliosis, depression and anxiety. (R. at 405-06.) She noted that Swiney's condition did not hinder her from caring for her child. (R. at 406.) By August 16, 2011, Swiney reported that her pregnancy was causing increased back pain. (R. at 360.) She also noted some anxiety. (R. at 360.) Physical examination again showed scoliosis without tenderness. (R. at 360.) Bendall diagnosed lumbago and prescribed Lidoderm patches. (R. at 360.)

Bendall completed a third Medical Evaluation form on September 30, 2011, based on the August 16, 2011, evaluation of Swiney, opining that she would not be able to participate in employment and training activities for six months due to her severe scoliosis, depression and anxiety. (R. at 413-14.) She did not address whether Swiney's condition hindered her ability to care for her child. (R. at 414.)

On November 15, 2011, Swiney advised Bendall that she was doing well after the birth of her son and noting no change since her last visit. (R. at 416.) A

physical examination showed scoliosis without spinal tenderness. (R. at 416.) Bendall diagnosed pallor; other malaise or fatigue; severe scoliosis; lumbago; dysthymic disorder; and bipolar 1 disorder, and she continued Swiney on Lidoderm patches. (R. at 416.) Bendall also completed a work-related physical assessment of Swiney, finding that that she could lift and/or carry items weighing up to five pounds both frequently and occasionally. (R. at 418-20.) She further found that Swiney could stand/walk and sit for a total of two hours each in an eight-hour workday and that she could perform each of these activities for two hours without interruption. (R. at 418-19.) Bendall opined that Swiney could never climb, balance or crawl, but occasionally stoop, kneel and crouch. (R. at 419.) She found that her abilities to reach and to push/pull were affected by her severe scoliosis and lumbago, which made it difficult and risky to perform these activities. (R. at 419.) Bendall opined that Swiney's abilities to work around heights, moving machinery and vibration were limited, as vibration increased her lumbago, and heights increased her risk of falling. (R. at 420.) She estimated that Swiney would miss more than two workdays monthly due to her impairments or treatment. (R. at 420.) Bendall based these limitations Swiney's diagnoses of severe scoliosis and lumbago. (R. at 418-20.)

When Swiney returned to Bendall on March 14, 2012, she expressed a concern that she was getting shorter. (R. at 438.) Bendall diagnosed severe scoliosis; lumbago; and dysthymic disorder, she prescribed Zoloft, Valium and Lortab, and she ordered x-rays of the lumbar and thoracic spine and both hips. (R. at 438.) These x-rays, dated March 15, 2012, showed moderate levoscoliosis centered at the thoracolumbar junction. (R. at 484.)

On April 27, 2011, Dr. Bert Spetzler, M.D., a state agency physician, completed a physical residual functional capacity assessment of Swiney, in conjunction with her initial DIB and SSI applications. (R. at 64-65.) Dr. Spetzler opined that Swiney could perform medium work that did not require concentrated exposure to hazards, such as machinery and heights. (R. at 64-65.) He acknowledged Swiney's history of scoliosis, but noted that she was able to stand, walk and move about normally. (R. at 67.) He further noted that physical examinations showed no loss of strength or control due to nerve damage. (R. at 67.) Lastly, Dr. Spetzler noted that Swiney was depressed from time to time, but was treated appropriately for her conditions and that records showed that she could care for her personal needs, remember information and communicate effectively with others. (R. at 67.)

Swiney presented to the emergency department at Wellmont Lonesome Pine Hospital, ("Lonesome Pine"), on December 9, 2012, with complaints of severe right leg pain without any history of trauma. (R. at 477-83.) On physical examination, Swiney was alert and oriented with grossly normal and symmetrical strength, neurologically, normal strength and range of motion of the spine on musculoskeletal examination, but mild diffuse pain involving the lateral mid-thigh, with no deformities, no local tenderness to the thigh or knee and no effusion. (R. at 479.) She had a normal mood, affect and cognition. (R. at 479.) X-rays of the right femur, knee and hip showed no evidence of acute fracture, Swiney was diagnosed with pain in the lower limb and patellofemoral pain, and she received a morphine injection. (R. at 479-80, 483.) She was discharged in improved condition with a prescription for hydrocodone-acetaminophen. (R. at 480.)

Bendall completed another work-related physical assessment of Swiney on February 15, 2013, finding that she could both occasionally and frequently lift and carry items weighing up to five pounds, that she could stand and/or walk and sit for a total of one hour each in an eight-hour workday, but for 45 minutes each without interruption, and that she could never climb, stoop, kneel, balance, crouch or crawl. (R. at 487-89.) She opined that reaching and pushing/pulling placed Swiney at risk for further damage/fall/injury and fractures and that working around heights, moving machinery, temperature extremes and vibration placed her at the same risks in addition to a risk of increased pain. (R. at 488-89.) Bendall further opined that Swiney would be absent from work more than two days monthly due to her impairments or treatment. (R. at 489.) She based these restrictions on Swiney's diagnoses of severe levoscoliosis at the thoracolumbar junction; osteoporosis; and lumbago. (R. at 487-89.)

The record shows that Swiney began seeing Anne B. Jacobe, L.C.S.W., a licensed clinical social worker at Solutions Counseling, LLC, as early as January 2008. (R. at 383-85.) In February, April, May, June and July 2008, as well as August, September and October 2009, Jacobe diagnosed Swiney with agoraphobia with panic disorder; and recurrent, moderate major depressive disorder. (R. at 375-82.) In December 2009, Jacobe added borderline personality disorder to Swiney's diagnoses. (R. at 374.) When she saw Jacobe on June 28, 2010, for individual counseling, she noted that she was taking no medications. (R. at 347, 372.) Swiney reported that she wanted to work and go to school, and she noted having difficulty with her son's father. (R. at 347, 372.) Swiney reported moderate depression and moderate irritability/anger, as well as decreased sleep, but she indicated that her energy level, appetite and attention/concentration all were "ok." (R. at 347, 372.) Swiney denied anxiety, crying spells and panic attacks, as well as

suicidal and homicidal ideation.  (R. at 347, 372.)  On mental status examination, Swiney was clean and causal in appearance.  (R. at 347, 372.)  Swiney noted that she had been denied disability benefits previously, and Jacobe encouraged her to look into her options again.  (R. at 347, 372.)  Jacobe diagnosed recurrent, moderate major depressive disorder; and agoraphobia with panic disorder.  (R. at 347, 372.)

Swiney continued treating with Jacobe during the relevant time period from March 2, 2011, through August 27, 2012.  Swiney advised Jacobe during visits on March 2, March 23, June 1 and July 29, 2011, as well as January 6 and January 24, 2012, that she continued to take no medications.  (R. at 348, 368-71, 430-31.)  She reported mostly moderate anxiety, with one report of severe anxiety on March 23, 2011.  (R. at 348, 368-71, 430-31.)  She also rated her depression as mostly moderate during this time.  (R. at 368-70.)  Irritability/anger generally was mild to moderate.  (R. at 348, 368-71, 430-31.)  Swiney's attention/concentration ranged from moderately decreased to none.  (R. at 348, 368-71, 431.)  Orientation and thought process were intact, with the exception of racing thoughts noted on March 2 and July 29, 2011.  (R. at 348, 368-71, 430-31.)  Swiney's judgment/insight was consistently fair.  (R. at 348, 368-71, 430-31.)  She consistently denied crying spells and suicidal or homicidal ideations, and, with the exception of reporting severe panic attacks on March 23, 2011, she also denied having panic attacks.  (R. at 348, 368-71, 430-31.)  Over this time, Swiney's mood was described as depressed, irritable, mixed and euphoric, and her affect was described as anxious and appropriate.  (R. at 348, 368-71, 430-31.)  Jacobe diagnosed Swiney with panic disorder without agoraphobia; major depressive disorder, recurrent, moderate; borderline personality disorder; moderate bipolar 1 disorder; agoraphobia with panic disorder; and social phobia.  (R. at 348, 368-71, 430-31.)

In March 2011, Swiney informed Jacobe that she was attending community college classes. (R. at 348, 371.) On March 23, 2011, she reported doing well with her pregnancy. (R. at 370.) On June 1, 2011, Swiney stated that she had not been as ill recently, and Jacobe noted that she was better able to manage her fears. (R. at 369.) On July 29, 2011, Jacobe noted that Swiney was making minimal progress, noting that she was not attending scheduled sessions. (R. at 368.) On January 6, 2012, she stated that she lost her TANF benefits. (R. at 431.) She also advised that she had experienced a panic attack at Walmart, that her school-age son was getting into trouble and that his father now wanted visitation and custody. (R. at 431.)

Jacobe completed a work-related mental assessment of Swiney on March 7, 2011, finding that she had a limited, but satisfactory, ability to understand, remember and carry out simple job instructions and to maintain personal appearance. (R. at 350-52.) She found that Swiney had a seriously limited ability to follow work rules, to relate to co-workers, to deal with the public, to use judgment, to function independently, to maintain attention/concentration, to understand, remember and carry out detailed job instructions, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 350-51.) She further found that Swiney had no useful ability to interact with supervisors, to deal with work stresses and to understand, remember and carry out complex job instructions. (R. at 350-51.) Jacobe based these restrictions on Swiney's irritability, low self-worth, trust issues, depression, poor memory and concentration and borderline personality disorder. (R. at 350-51.) She concluded that Swiney would be absent from work more than two days monthly due to her impairments or treatment. (R. at 352.)

On January 6, 2012, Jacobe completed another work-related mental assessment, finding that Swiney had a limited, but satisfactory, ability to follow work rules, to interact with supervisors, to understand, remember and carry out simple job instructions and to maintain personal appearance. (R. at 426-28.) She further found that Swiney had a seriously limited ability to relate to co-workers, to use judgment, to function independently, to understand, remember and carry out detailed job instructions and to demonstrate reliability. (R. at 426-27.) Jacobe found that Swiney had no useful ability to deal with the public, to deal with work stresses, to maintain attention/concentration, to understand, remember and carry out complex job instructions, to behave in an emotionally stable manner and to relate predictably in social situations. (R. at 426-27.) Jacobe concluded that Swiney would be absent from work more than two workdays monthly due to her impairments or treatment. (R. at 428.) She based her findings on Swiney's reported panic attacks, her history of bipolar disorder, her reports of decreased concentration, avoidance of people and anhedonia, as well as anxiety, history of OCD and reports of back and hip pain. (R. at 426-28.)

Swiney saw Jacobe again on March 22, 2012, at which time she advised her that she was taking Zoloft and Valium and was feeling "some better." (R. at 444.) She saw Jacobe for five visits after restarting her psychotropic medications, from March 22, 2012, through August 27, 2012. (R. at 440-44.) Over this time, Swiney had moderate, mild and decreasing anxiety and decreasing to no depression, except for severe depression on March 22, 2012. (R. at 440-44.) She had no, mild or moderate irritability/anger, and her attention/concentration was generally "ok" or mildly decreased. (R. at 440-44.) Orientation and thought process were intact, with the exception of racing thought process on March 22 and August 27, 2012. (R. at 440-44.) Swiney's judgment/insight was good or fair. (R. at 440-44.) She

consistently denied crying spells, with the exception of moderate crying spells on March 22, 2012. (R. at 440-44.) Likewise, she denied panic attacks and suicidal or homicidal ideations. (R. at 440-44.) Swiney's mood was described as euphoric, depressed and mixed, and her affect was described as appropriate. (R. at 440-44.) Jacobe diagnosed Swiney with bipolar 1 disorder. (R. at 440-44.) On June 18, 2012, Swiney advised that she was doing some better and that Zoloft was helping. (R. at 443.) On July 17, 2012, Swiney reported decreased procrastination and an increased ability to complete housework. (R. at 442.) She stated that her medications helped "a lot." (R. at 442.) On July 30, 2012, Swiney reported that she was feeling much better and that she had an increased interest in previous activities. (R. at 441.) On August 27, 2012, she reported doing "ok." (R. at 440.)

Swiney saw B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, for a consultative psychological evaluation at the request of Disability Determination Services on June 8, 2011. (R. at 353-58.) She was very clean and casual in appearance. (R. at 353.) On mental status examination, Swiney was appropriately oriented, cooperative, conversational, "very talkative" and "quite expressive." (R. at 355.) Her memory processes were intact, as she could recall four of five words on the first try, all of the words on the second try and all five after approximately 10 minutes, suggesting good short-term memory. (R. at 355.) Swiney could perform average math computations, she interpreted three commonly used adages, suggesting good abstract ability, she could attend and concentrate without difficulty, she could count backwards from 100 by threes to 79, she could spell "world" backward, she could follow directions, and questions did not need to be repeated. (R. at 355.) Lanthorn estimated her intelligence to be in the average range. (R. at 355.) Swiney's affect was appropriate, she did not appear anxious, restless or fidgety, she appeared in no acute distress, eye contact was good, and

there were no observable tremors or psychomotor retardation, but she walked with a slightly awkward gait.  (R. at 355.)  Swiney denied hallucinations and previous suicide attempts, but acknowledged previous thoughts of suicide when she was younger.  (R. at 355.)  There were no overt indications of delusional thinking, and Swiney appeared to be rational and alert.  (R. at 356.)

Swiney reported that her mood fluctuated, and she tried to keep to herself when she was in a bad mood. (R. at 356.) However, she stated that "bad spell[s]" went away quickly. (R. at 356.) Swiney described her bipolar symptoms as being moody and not wanting to go places. (R. at 356.) However, she stated "Sometimes it's okay." (R. at 356.) Lanthorn opined that, personality disorder traits appeared more representative of Swiney's then-current functioning. (R. at 356.) She described her daily activities to include getting her son up and making him cereal, using Facebook, "clean[ing] up the messes," doing laundry, preparing dinner, occasionally going to the grocery store for small amounts, visiting her mother and reading. (R. at 356.) She noted that she had a couple of friends. (R. at 356.) Lanthorn noted that Swiney performed self-help skills and drove and traveled alone. (R. at 356.) He further noted that she related adequately and appeared capable of managing her own resources. (R. at 356.)

Lanthorn diagnosed Swiney with personality disorder with histrionic features, and he assessed her then-current Global Assessment of Functioning, ("GAF"),[6] score at 60.[7]  (R. at 357.)  He opined that Swiney could understand and

---

[6] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health – illness."  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

remember, attend and concentrate, should be able to maintain basic routines and might be mildly limited in social interaction due to personality disorder traits. (R. at 357.) He estimated Swiney's intellectual functioning to be average. (R. at 357.) He further opined that Swiney was only mildly limited in her general adaptation skills, that she could be aware of simple hazards and take precautions, and she should be able to set goals and make plans to achieve them independently, work in proximity to others with only mild difficulty and adapt to change, and she may have mild difficulty dealing with stress. (R. at 357.) Lanthorn recommended that she continue counseling, and he rated her prognosis as favorable. (R. at 357-58.)

On June 27, 2011, Dr. Andrew Bockner, M.D., a state agency physician, completed a Psychiatric Review Technique form, ("PRTF"), of Swiney in connection with the initial review of her DIB and SSI claims. (R. at 62-63.) Dr. Bockner opined that Swiney was mildly restricted in her activities of daily living, experienced mild difficulties in maintaining social functioning and in maintaining concentration, persistence or pace and had experienced no repeated episodes of decompensation, each of extended duration. (R. at 63.) Dr. Bockner concluded that Swiney suffered from a nonsevere personality disorder. (R. at 63.)

On October 14, 2011, Louis Perrott, Ph.D., a state agency psychologist, completed another PRTF of Swiney in connection with the reconsideration of her DIB and SSI claims. (R. at 87-88.) Perrott opined that Swiney had no restrictions on her activities of daily living, experienced mild difficulties in maintaining social functioning and in maintaining concentration, persistence or pace and had experienced no repeated episodes of decompensation, each of extended duration.

---

[7] A GAF score of 51 to 60 indicates "[m]oderate symptoms … OR moderate difficulty in social, occupational, or school functioning. …" DSM-IV at 32.

(R. at 88.)  Perrott concluded that Swiney did not suffer from a severe mental impairment.  (R. at 88.)  The same day, Dr. John Sadler, M.D., a state agency physician, completed a physical residual functional capacity assessment of Swiney, finding that she could perform medium work that required no more than occasional climbing of ladders, ropes or scaffolds and stooping, and that she should avoid concentrated exposure to hazards, such as machinery and heights.  (R. at 89-91.) Dr. Sadler noted Swiney's history of scoliosis, but found that she was able to stand, walk and move about within normal limits and that the evidence showed no significant muscle weakness or loss of control due to nerve damage.  (R. at 93.) He further noted that, although Swiney occasionally felt nervous and depressed, her condition had not affected her ability to understand, remember, cooperate with others or perform normal daily activities.  (R. at 93.)

Family nurse practitioner Bendall also completed a work-related mental assessment of Swiney on November 15, 2011, finding that she had a limited, but satisfactory, ability to follow work rules, to function independently, to understand, remember and carry out simple job instructions, to maintain personal appearance, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 422-24.) She found that she had a seriously limited ability to use judgment and to understand, remember and carry out both detailed and complex job instructions. (R. at 422-23.) Bendall found that Swiney had no useful ability to relate to co-workers, to deal with the public, to interact with supervisors, to deal with work stresses and to maintain attention/concentration. (R. at 422-23.) She opined that Swiney would be absent from work more than two workdays monthly due to her impairments or treatment. (R. at 424.)  Bendall based her findings on Swiney's diagnoses of dysthymic

disorder, bipolar disorder, decreased concentration and increased anxiety. (R. at 422-23.)

Bendall completed another work-related mental assessment of Swiney on February 15, 2013, finding that she had a limited, but satisfactory, ability to function independently and to understand, remember and carry out simple job instructions. (R. at 491-93.) She found that Swiney had a seriously limited ability to follow work rules, to use judgment, to understand, remember and carry out both detailed and complex job instructions, to maintain personal appearance, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 491-92.) Bendall also found that Swiney had no useful ability to relate to co-workers, to deal with the public, to interact with supervisors, to deal with work stresses and to maintain attention/concentration. (R. at 491-92.) Bendall based these restrictions on Swiney's diagnoses of dysthymic disorder; bipolar disorder; decreased concentration; and increased anxiety, as found by Solutions Counseling. (R. at 491-92.) She opined that Swiney would be absent from work more than two days monthly due to her impairments or treatment. (R. at 493.)

Swiney saw Robert S. Spangler, Ed.D., a licensed psychologist, for a consultative psychological evaluation at her counsel's referral, on March 21, 2013. (R. at 499-502.) She was clean, neat, appropriately dressed and cooperative. (R. at 499.) Spangler noted that Swiney had a slow gait with an "unusual wobble," and her general activity level was hyper. (R. at 499.) He described her as socially confident during the evaluation, as well as anxious and depressed. (R. at 499.) She generally understood the instructions for each task, but demonstrated erratic concentration secondary to anxiety and depression, and she had difficulty staying

on task, preferring to talk about her perception of her mental health problems. (R. at 499.) Swiney was appropriately persistent on tasks, but pace was impacted, as she stood frequently between tasks and shifted in her seat. (R. at 499.) Swiney stated that she "cracked" in 2007 when she began having more severe mood swings and relationship problems with her boyfriend. (R. at 499.) She reported approximately 16 panic attacks monthly, lasting four to five minutes and requiring 30 to 45 to recover. (R. at 500.) Spangler found Swiney to be an adequate historian and credible. (R. at 500.)

On mental status examination, Swiney was alert and fully oriented with adequate recall of remote and recent events. (R. at 500.) She had fair eye contact, tense motor activity, an anxious and depressed mood and congruent affect, but she was cooperative, compliant and forthcoming. (R. at 500.) She repeated three words after five minutes, eight numbers serially forward and five numbers backward. (R. at 500.) Swiney performed serial 7's slowly and serial 5's adequately, and she could interpret common proverbs adequately. (R. at 500.) Judgment and insight were consistent with average intelligence, her stream of thought was unremarkable, associations were logical, thought content was nonpsychotic, and perceptual abnormalities were not noted. (R. at 500.) Spangler opined that Swiney was functioning in the average range of intelligence and was emotionally labile. (R. at 500.) She denied suicidal or homicidal ideations, and delusional thought was not evident. (R. at 500.)

Swiney reported daily activities to include cooking on a "good day," with the assistance of a stool, but microwaving food on "bad days," cleaning with the assistance of her husband, doing laundry, occasionally grocery shopping, walking her dog, watching television and reading. (R. at 500-01.) She reported that she

was up and down all night due to low back, right leg and left hip pain, as well as racing thoughts, causing her to feel exhausted all the time. (R. at 501.) Spangler deemed Swiney's social skills as adequate, and she related well to him. (R. at 501.) He found that she had the necessary judgment to handle her financial affairs if awarded benefits. (R. at 501.)

Spangler administered the Wechsler Adult Intelligence Scale – Fourth Edition, ("WAIS-IV"), on which Swiney obtained a full-scale IQ score of 83, placing her in the low average range of intelligence. (R. at 501.) Spangler also administered the Wide Range Achievement Test – Fourth Edition, ("WRAT-4"), on which Swiney scored at the 12.5 grade level in reading, the 12.9+ grade level in sentence comprehension and the 6.9 grade level in arithmetic computation. (R. at 502.) Her pace was inadequate as objectively tested. (R. at 502.) Spangler diagnosed Swiney with panic disorder without agoraphobia, moderate to severe; generalized anxiety disorder, moderate; dysthymic disorder, early onset, chronic, moderate; average intelligence; erratic concentration, moderate to severe; and rule out personality disorder. (R. at 502.) He placed her then-current GAF score at 50[8] to 55, and he deemed her prognosis as guarded. (R. at 502.) Spangler opined that Swiney should continue mental health treatment for more than 12 months. (R. at 502.)

Spangler also completed a work-related mental assessment, finding that Swiney had a seriously limited ability to follow work rules, to use judgment, to interact with supervisors, to function independently, to understand, remember and carry out simple job instructions, to maintain personal appearance, to behave in an

---

[8] A GAF score of 41 to 50 indicates "[s]erious symptoms … OR any serious impairment in social, occupational, or school functioning. …" DSM-IV at 32.

emotionally stable manner and to relate predictably in social situations. (R. at 503-05.) He found that she had no useful ability to relate to co-workers, to deal with the public, to deal with work stresses, to maintain attention/concentration, to understand, remember and carry out both detailed and complex job instructions and to demonstrate reliability. (R. at 503-04.) Spangler based these restrictions on his diagnoses of Swiney, as stated above, as well as her marginal math skills and her slow pace, which impacted even the ability to carry out simple job instructions in a timely manner. (R. at 504.) He further opined that moderate to severe levels of anxiety, combined with moderate depression, impacted all work-related behavior, and Swiney's slow pace rendered her noncompetitive. (R. at 505.) He found that she could manage benefits in her own best interest "on good days," but that she would be absent from work more than four days monthly on average due to her mental impairments or treatment. (R. at 505.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2015). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2015).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2011 & West 2012); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Swiney argues that the ALJ erred by failing to evaluate her spine impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1, § 14.09, the medical listing for inflammatory arthritis. (Plaintiff's Memorandum In Support Of Her Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-6.) Swiney also argues that the ALJ erred by improperly determining her residual functional capacity. (Plaintiff's Brief at 6-8.) More specifically, Swiney argues that the ALJ erred in his weighing of the medical evidence and should have given more weight to the opinions of family nurse practitioner Bendall and licensed clinical social worker Jacobe, both treating sources, as well as licensed psychologist Spangler, a consultative examiner. (Plaintiff's Brief at 6-8.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether

substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

I find unpersuasive Swiney's first argument that the ALJ erred by failing to consider her back impairment under § 14.09, the medical listing for inflammatory arthritis. Such back impairments typically are analyzed under the medical listings found in 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.00 *et seq.* The ALJ, in his decision, considered whether Swiney's back impairment met or equaled the criteria for § 1.04, the medical listing for disorders of the spine. (R. at 15-21.) However, after evaluating the evidence of record, the ALJ determined that the objective medical evidence did not support such a finding. (R. at 15-21.) Swiney does not challenge this finding. However, Swiney is correct that, under § 1.00(L), which discusses abnormal curvature of the spine, scoliosis can result in impaired ambulation. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(L) (2015). Furthermore, the Social Security Regulations provide that, when such impaired ambulation exists, evaluation of equivalence may be made by reference to § 14.09(A).

The Regulations define an inability to ambulate effectively as an "extreme limitation of the ability to walk; *i.e.*, an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b)(1) (2015). Generally, ineffective ambulation is defined as "having insufficient lower extremity functioning … to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities."

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b)(1). Conversely, in order to ambulate effectively, an individual must be "capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b)(2) (2015). Examples of ineffective ambulation include an inability to walk without the use of a walker, two crutches or two canes and the inability to carry out routine ambulatory activities, such as shopping and banking. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b)(2).

The Regulations state that listing-level severity in § 14.09(A) is shown by an impairment that results in an "'extreme' (very serious) limitation." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.00(D)(6)(e)(i) (2015). "[T]he criterion is satisfied with persistent inflammation or deformity in one major peripheral weight-bearing joint resulting in the inability to ambulate effectively …." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.00(D)(6)(e)(i). In order to meet or equal listing § 14.09(A), Swiney must prove that her impairment "meet[s] *all* of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan*, 493 U.S. at 530.

Here, I find that the evidence of record does not demonstrate that Swiney had an inability to ambulate effectively, as contemplated by 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 1.00 and 14.09(A). More specifically, the record reveals that she advised Spangler that she walked her dog. She also admitted that, generally, she could care for her small children, asking for help once weekly or less. Swiney also expressed a desire in June 2010 to return to school, which she

had done by March 2011. In June 2011, Lanthorn noted that Swiney walked with only a slightly awkward gait. (R. at 355.) She advised Lanthorn that she could care for her child, clean messes around the house, do laundry, prepare dinner, occasionally grocery shop and visit her mother. Lanthorn noted that Swiney performed self-help skills and drove and traveled alone. She was consistently described as clean and casual in appearance. In March 2013, Swiney reported daily activities to include cooking light meals on a daily basis, cleaning with assistance, doing laundry and occasionally grocery shopping. In a March 15, 2011, Function Report, Swiney reported showering, caring for her child, and performing light housework, including doing laundry, washing dishes, wiping counters and sweeping. (R. at 238, 240.) She stated that she prepared food for her four-year-old son and helped him bathe. (R. at 239.) She acknowledged having no problems with personal care, and she indicated that she could drive and go out alone. (R. at 239-40.) Swiney indicated that she did not use crutches, a walker, a wheelchair, a cane or braces or splints. (R. at 244.) Another Function Report, dated September 28, 2011, indicated no changes from the previous Report, and in an undated Function Report, Swiney indicated essentially the same functions and limitations as the March 2011 Report. (R. at 256-57.) In yet another, undated, Report, she also indicated that she could walk approximately one block before stopping and resting. (R. at 264.) She, again, indicated that she did not use any assistive devices to help her walk or get around. (R. at 265.)

Thus, for all of the above-stated reasons, I find that there is no medical evidence in the record that Swiney could not ambulate effectively. That being the case, I further find that substantial evidence supports the ALJ's failure to analyze her back impairment under § 14.09(A).

I further find that substantial evidence supports the ALJ's weighing of the medical evidence and ultimate residual functional capacity finding. More specifically, I find unpersuasive Swiney's argument that the ALJ erred by failing to accord more weight to the opinions of Bendall, Jacobe and Spangler. In his decision, the ALJ stated that he was giving the opinions of Bendall and Jacobe little weight because they were not supported by their own clinical findings or conservative treatment and were inconsistent with the opinions rendered by the medical expert at the hearing and by the reviewing physicians and psychologists at the initial and reconsideration levels. (R. at 20.) The ALJ further stated that he was giving little weight to psychologist Spangler's opinion because it was based on a one-time examination and was not supported by his own clinical findings or the other objective evidence of record. (R. at 20-21.) The ALJ also noted that Bendall and Jacobe are not considered acceptable medical sources under the Regulations, but "other sources." I first will address Swiney's physical residual functional capacity before turning to her mental residual functional capacity.

The ALJ correctly noted that Bendall and Jacobe, a family nurse practitioner and a licensed clinical social worker, respectively, do not qualify as acceptable medical sources under the Regulations, but as "other sources." *See* 20 C.F.R. §§ 404.1513(d), 416.913(d) (2015). This means that their opinions may not be used to establish the existence of a medically determinable impairment, but they may be used to determine its severity and its effect on an individual's ability to work. *See* 20 C.F.R. §§ 404.1513(d), 416.913(d). This also means that, even though both Bendall and Jacobe treated Swiney, they are not considered "treating sources" whose opinions may be entitled to controlling weight. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (2015); *see also Myers v. Astrue*, 2012 WL 4050182, at *8 (E.D. Va. Jul. 6, 2012). In weighing such "other source" opinions,

the ALJ may consider such factors as the scope of the relationship with the patient, consistency, support, quality of explanation, specialty and other relevant factors. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c) (2015).

Bendall, Swiney's treating family nurse practitioner, completed two physical assessments, one in November 2011, and another in February 2013, finding, among other things, that Swiney could occasionally and frequently lift and carry up to only five pounds, that in 2011, she could stand/walk for a total of two hours in an eight-hour workday and sit for two hours in an eight hour workday, and in 2013, that she could stand/walk for only one hour each. I find that such limitations are not supported by the clinical findings, which show benign examinations and that Swiney received only limited treatment for her scoliosis during the time period relevant to the disability decision. For instance, in January, February, August and November 2011, Swiney had no spinal tenderness on physical examination. In June 2011, she even reported a desire to return to school. In February 2011, Swiney reported increased back pain, but she advised that she was pregnant, off of her medications and had a urinary tract infection. Nonetheless, in August 2011, Swiney reported doing better than she thought she would with no medications. In March 2012, her only complaint was that she was getting shorter. Bendall treated Swiney conservatively with medications, including Lortab and Valium, and her treatment notes contain no restrictions on Swiney's activities. Thus, the relatively benign findings contained within Bendall's treatment notes, as well as her conservative treatment of Swiney's back impairment, are inconsistent with the severe restrictions she placed on her in the November 2011 and February 2013 physical assessments.

Additionally, the objective medical evidence of record does not support such restrictive limitations. For instance, March 2012 x-rays showed only moderate levoscoliosis centered at the thoracolumbar junction, and December 2012 x-rays of the right femur, knee and hip showed no evidence of acute fracture. Bendall's severe limitations of Swiney also are not supported by the other physical examinations contained in the record. For instance, during a February 2011 emergency department visit for sharp back pain, it was determined that Swiney was pregnant and had a urinary tract infection. She did have a decreased range of motion of the back, but no apparent motor or sensory deficit. During a December 2012 emergency department visit for severe right leg pain, neurologically, Swiney had grossly normal and symmetrical strength, and she exhibited normal strength and range of motion on musculoskeletal examination. She had mild, but diffuse, pain of the lateral mid-thigh area without deformities, local tenderness to the thigh or knee or effusion. She was treated conservatively with hydrocodone-acetaminophen.

I further find that the ALJ correctly noted in his decision that Swiney was not being treated by an orthopedist for her scoliosis, but saw a nurse practitioner approximately every three months for treatment of this condition. Moreover, the evidence of Swiney's functioning during the relevant time period does not support Bendall's restrictions. In the Medical Evaluation forms that Bendall completed in connection with Swiney's receipt of TANF benefits, she found that her condition did not hinder her ability to care for her child. Likewise, Swiney acknowledged in Function Reports that she could care for her small child, including feeding him and helping him bathe. Swiney's testimony, as well as Function Reports and reports to psychologist Spangler and Lanthorn, also indicate that she could perform some light housework, make light meals on a daily basis, wash laundry, wash dishes,

wipe counters, sweep and shop for groceries and necessities weekly. Thus, this evidence of Swiney's activities further supports the ALJ's decision to give little weight to Bendall's opinion regarding her physical limitations.

Lastly, I find that the above-mentioned record evidence supports the state agency physicians' opinions. In April 2011, Dr. Spetzler opined that Swiney could perform medium work, but that she should avoid concentrated exposure to hazards, such as machinery and heights. Likewise, in October 2011, Dr. Sadler made the same findings, except he opined that Swiney could only occasionally climb ladders, ropes or scaffolds and stoop. In any event, the ALJ did give some credence to Swiney's subjective complaints, ultimately finding that she could perform only a range of light work.

Turning to the ALJ's weighing of the evidence with regard to Swiney's mental impairments, I, likewise, find that it is supported by substantial evidence. Bendall completed two mental assessments, one in November 2011 and another in February 2013. In November 2011, she opined that Swiney had a limited, but satisfactory, ability to follow work rules, to function independently, to understand, remember and carry out simple job instructions, to maintain personal appearance, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. She opined that Swiney had a seriously limited ability to use judgment and to understand, remember and carry out both detailed and complex job instructions and no useful ability to relate to co-workers, to deal with the public, to interact with supervisors, to deal with work stresses and to maintain attention/concentration. In February 2013, Bendall opined that Swiney was even more limited, finding that she had a limited, but satisfactory, ability to function independently and to understand, remember and carry out simple job

instructions. In all other areas of work-related mental functioning, Bendall opined that Swiney had either a seriously limited or no useful ability.

I find that the ALJ's conclusion that such limitations were not supported by Bendall's treatment notes is supported by substantial evidence. With regard to Bendall's own treatment notes during the relevant time period, Swiney had limited complaints, and Bendall offered limited mental health treatment. For instance, in January 2011, Swiney reported not going anywhere and not socializing, and in August 2011, she reported some anxiety. However, in February and November 2011, as well as March 2012, no mention was made of Swiney's mental impairments. Over this time period, Bendall diagnosed Swiney with bipolar disorder and dysthymic disorder,[9] and she prescribed Zoloft and Valium, but she noted no mental limitations. For all of these reasons, I find that the limitations as found by Bendall are inconsistent with her own treatment notes.

Jacobe, a licensed clinical social worker, who provided mental health counseling to Swiney during the relevant time period, completed two mental assessments, dated March 7, 2011, and January 6, 2012. Jacobe opined in these assessments that Swiney had either a seriously limited or no useful ability in 11 to 13 of the 15 areas of functioning assessed. In 2011, she opined that Swiney had a seriously limited ability to maintain attention/concentration, while in 2012, she opined that Swiney had no useful ability to do so. Jacobe further opined that Swiney had a limited, but satisfactory, ability to maintain personal appearance and to understand, remember and carry out simple job instructions in both 2011 and

---

[9] It appears that such diagnoses were initially made prior to Swiney's alleged onset date and that Bendall continued them during the relevant time period, despite little complaint from Swiney regarding her mental impairments.

2012.  However, such opinions are not supported by the record evidence, including Jacobe's own treatment notes. For instance, during the relevant time period, Swiney informed Jacobe that she was doing "ok," that she had decreased mood swings, she generally reported no panic attacks, she often demonstrated "ok" or "increased" attention/concentration, she was able to attend community college classes, and she spent time reading. Swiney typically had no more than moderate depression or anxiety and often reported only mild or no depression or anxiety. Additionally, Jacobe's treatment notes indicate that Swiney's medications helped her condition, and that she reported feeling better with decreased procrastination and increased completion of housework. Thus, Jacobe's opinions were inconsistent with her own treatment notes, and the ALJ did not err in according them little weight. Furthermore, Jacobe never recommended that Swiney be referred to a licensed psychologist or to a psychiatrist for further evaluation and/or treatment, and the record shows that she has never been psychiatrically hospitalized nor sought emergent psychiatric treatment. Thus, I find that Jacobe's harsh limitations on Swiney are not supported by her own treatment notes.

Psychologist Spangler completed a one-time consultative examination of Swiney and an accompanying mental assessment in March 2013.  Spangler is considered an acceptable medical source under the Regulations.  *See* 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2) (2015).  The ALJ must consider the same factors as set out above in deciding the weight to assign to the opinion of such an acceptable medical source.  *See* 20 C.F.R. §§ 404.1527(c), 416.927(c).  Spangler opined that Swiney was seriously limited in eight out of the 15 functional areas assessed, and he opined that she had no useful ability in the remaining seven areas.  In particular, Spangler opined that she had a seriously limited ability to understand, remember and carry out simple job instructions, to maintain personal appearance and to relate

predictably in social situations. However, in the body of his report, Spangler noted that Swiney was clean, neat and appropriately dressed, and she generally understood the instructions for each task. He further noted that she had fair eye contact, was cooperative, compliant and forthcoming, and he concluded that her social skills were adequate, and she related well to him. Additionally, Spangler opined that Swiney had no useful ability to maintain attention/concentration. Nonetheless, he stated in the body of his report that she had adequate recall of remote and recent events. He further reported that she repeated three words after five minutes, eight numbers serially forward and five numbers backward. She performed serial 7's slowly and serial 5's adequately. Thus, as the ALJ noted, Spangler's opinions are inconsistent with the findings contained within the body of his examination report.

In addition to being inconsistent with their own treatment notes, the opinions of Bendall, Jacobe and Spangler are not supported by the other substantial evidence of record, including the June 2011 opinion of psychologist Lanthorn, the psychological expert's testimony and the opinions of the state agency physicians and psychologists. First, I note that Lanthorn examined Swiney on one occasion, just as Spangler did. However, his opinions are consistent with his examination of Swiney, as well as the other substantial evidence of record. Lanthorn opined that Swiney could understand and remember, attend and concentrate, should be able to maintain basic routines and might be mildly limited in social interaction. He estimated her intellectual functioning to be average, and he placed her GAF score at 60, indicating moderate symptoms. Lanthorn further opined that Swiney was only mildly limited in her general adaptation skills, that she could be aware of simple hazards and take precautions, and she should be able to set goals and make plans to achieve them independently, to work in proximity to others with only mild

difficulty and adapt to change, and she may have mild difficulty dealing with stress.  These opinions are supported by Lanthorn's examination of Swiney, during which he noted that she was very clean and casual in appearance, she was appropriately oriented, cooperative, conversational, very talkative and quite expressive.  She could recall four of five words on the first try, all of the words on the second try and all five after approximately 10 minutes, suggesting good short-term memory.  She could attend and concentrate without difficulty, she could count backwards from 100 by threes to 79, she could spell "world" backward, she could follow directions, and questions did not need to be repeated.  Swiney's affect was appropriate, she did not appear anxious, restless or fidgety, eye contact was good, and she appeared to be rational and alert.

Lanthorn's findings are supported by the testimony of psychological expert Gardner, who concluded that Swiney's mental impairments did not meet or equal a listed impairment because the record supported a finding that she had only mild restrictions in her activities of daily living, experienced mild to moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace and had experienced no episodes of decompensation, each of extended duration.  Lanthorn's findings also are consistent with those of the state agency physicians and psychologists, who found in June and October 2011, that Swiney had no to mild restrictions on her activities of daily living, experienced only mild difficulties in maintaining social functioning and in maintaining concentration, persistence or pace and had experienced no episodes of decompensation, each of extended duration.

I note that Bendall's, Jacobe's and Spangler's opinions also are not supported by mental status examinations performed during the emergency

department visits in February 2011 and December 2012. In February 2011, Swiney was described as fully oriented, and in December 2012, she was described as alert and oriented with a normal mood, affect and cognition. Swiney also indicated throughout the record that medications helped her condition. For instance, Swiney began taking Zoloft and Valium in March 2012, after having given birth to her son the previous October. By June 2012, she stated that Zoloft was helping. On July 30, 2012, she reported feeling much better, noting decreased anger and increased interest in previous activities, among other things. On August 27, 2012, Swiney reported medication compliance and doing "ok." It is well-settled that "[i]f a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986).

Based on the above reasoning, I conclude that substantial evidence exists to support the ALJ's weighing of the evidence in determining Swiney's residual physical and mental functional capacity, and I find that the ALJ was not obligated to analyze her back impairment under § 14.09(A). An appropriate order and judgment will be entered.

DATED:     March 21, 2016.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE